Thank you, Your Honor. May it please the Court, I am here today for Mr. Lugo. Mr. Lugo challenges his conviction on count four. That count was for aiding and abetting the attempted exportation of firearms. To prove an aiding and abetting offense, the government has to show the substantive offense. They did that here. They show that Sarai Mongoria, Danny Macias, and Leroy Milligan tried to export firearms from San Antonio to Mexico. So they proved the substantive offense. What they didn't prove was that Mr. Lugo aided and abetted that offense. To prove someone is guilty as an aider and abetter, the government has to show that the person associated with the criminal venture purposely participated in the criminal activity and sought by his actions to help make it succeed. The government didn't do that here. The government showed a firearm conspiracy, but they didn't show Mr. Lugo had any actual involvement in this particular episode on August 7th of 2012. And for that reason, the conviction has to fail. So I have to go, it's a little bit of an unusual case, I think we have to go through the evidence, which normally we don't spend as much time on facts here, but I think we have to. Sarai Mongoria was stopped driving a truck in which a number of firearms and a fair amount of ammunition was found. She testified that she was hired by Danny Macias, paid by Danny Macias, given a truck by Danny Macias. After she was arrested, Danny Macias was the one who came to her and said, I need paper. That is, I need to show something from police that your truck was seized from you. Nothing by Mr. Lugo. Ms. Mongoria testified she never had any contact with Mr. Lugo. So there's nothing from the driver. There's no testimony from Danny Macias, but Mongoria puts him as the person who hired her and paid her, provided the truck. Leroy Milligan was the man who hid the weapons in the truck. His role in the offense in San Antonio, people would bring him trucks, he would build the trucks for this woman. He says that La Tripa, Mr. Villalobos, would send people to him. Again, no mention of Mr. Lugo, and in fact he says he never talked to Mr. Lugo. Well, Counselor, it's certainly true that the direct evidence regarding what happened with that particular truck doesn't tie your client to it, but help us, since this is the most recent and a circumstantial evidence case. I think that is the key to it, Your Honor. That's right. What Salazar's testimony doesn't do, it absolutely fails the third part. I think it fails the second part of the aiding and abetting because I don't think it shows purposeful participation. It shows a claim that he was somehow involved with the load, although I will note that Mr. Salazar's own testimony is they had lost the load. The prosecutor kind of puts words in his mouth when he said what he says, and you're saying that Mr. Lugo was claiming this load? Salazar just says yes, but we have to consider that. He accepted those words, did he not, the witness? I'm sorry? You said he put the words in his mouth, but the witness accepted the words that you just described. Well, yes, but this is always the problem when the prosecutor testifies rather than the witness. Simple assent to what — simple assent by a cooperating witness, but I'm not arguing that that alone. The main reason this doesn't do it is because it doesn't show any affirmative action by Mr. Lugo by which he sought to help the action succeed. He is identifying somehow with gun smuggling and maybe even with that load in particular as a member of an organization, but that's why they got him on the conspiracy charge. But on the aiding and abetting, they have to show some affirmative action, and they don't, even with Salazar's testimony. Mr. Salazar simply says yes to the prosecutor's question. He does not say Lugo paid somebody. He does not say Lugo provided a truck to somebody. He does not say any of that. And so we just don't have an affirmative action. We don't have that he sought by his actions to help the venture succeed. And the law is very clear that you need that. You have to help the venture succeed. I can't say that. How do we distinguish between an overt act and a conspiracy and an affirmative action in aiding and abetting? Well, an overt act can be by any one of the conspirators. So as long as he has agreed with Ms. Longoria, and they found him guilty of that and we're not challenging that, or he's agreed with somebody, and it doesn't have to be Ms. Longoria in this incident. He was involved in other firearm smuggling attempts. He agreed with somebody at that point. Someone else took an overt action. He's guilty of conspiracy. But aiding and abetting is a different offense. And the government wants a two-for-one here. They want evidence that does help establish a conspiracy to claim that he's guilty of aiding and abetting. But I think this Court's cases require a little bit more. The law is very clear. And I think Rojas Alvarez is not exactly on point, but it does talk, because it's a drug case in a hidden compartment. It's 451 FedSecond320. It does talk about the need for an affirmative action that shows you're trying to help the bench succeed. Are you arguing that the evidence from Salazar is – you're not arguing that it's not probative. You're arguing that the weight of it was not sufficient for the jury to make the connection. Is that what you're arguing, in effect? Yes. You're not arguing that that's defective evidence, right? No, I'm not arguing that's defective evidence. I'm arguing – You're arguing the weight of that evidence is not sufficient and probative in your view. I – well, again, I hesitate the word probative. I would say that, as I said in my brief, that the problem with this, which is exactly the problem that Rojas Alvarez's Court identified, is that you can't convict someone for aiding and abetting on mere surmise, speculation, conjecture, or a series of inference pilings. And that's all the government has here on the aiding and abetting. They did not show a possibility. Let me ask you about the surmise. I'm sorry, Counselor, you don't have much time. On the surmise, you did have Salazar testify that Lugo told him that he had tried to do the same thing on this kind of weapon smuggling using a gas tank, but she had been stopped. Now, there are a lot of assumptions, a lot of circumstantial evidence, assumptions that have to be drawn from that. But aren't they there under our case law? Can't you draw it from there? What's the problem with what I just read? Why isn't that enough? Well, I think they is important because they did establish that Lugo was a member of this organization. So when he says they, he's talking about somebody in the organization in the same way that we often say, you know, we did something when in fact we didn't personally participate. And I think they need a little bit more than simply identifying. Otherwise, conspiracy and aiding and abetting merge and the government can simply divide up the conspiracy into an endless series of aidings and abettings and say it was enough that you agreed that you had something to do with that particular load or your organization had something to do with that particular load. I think you need an affirmative act. Wasn't there, this was a jury trial, right? It was a jury trial. Was there a jury instruction given on aiding and abetting? There was. The pattern charge? The pattern charge. All right. So we don't have any issue on appeal about an errant charge to the jury delineating the difference between the elements in the crime, right? May I proceed, Your Honor? Of course. Thank you. No, we don't have any issue with that. So it's just an, it's an evidentiary argument, right? I would say it's a legal and evidentiary argument. The law requires, in my view, an affirmative act that he sought to help. The evidence doesn't show an affirmative act in this particular incident, and so I would say he couldn't be guilty of aiding and abetting the August 7, 2012. Thank you. All right. Thank you, Mr. Lynch. You've reserved a little bit of time. Mr. Morales, on behalf of Mr. Villalobos, I'll call it. May it please the Court? Mr. Villalobos argues that the evidence is insufficient. There's key moments in the trial where very important witnesses, Leroy Milligan as well as Ms. Lopez, are not able to identify Mr. Villalobos. In fact, this coupled with the prosecutorial conduct wherein they are suggestive to the witness as to who Mr. Villalobos is. In fact, at one point, the prosecutor's questions are, and so let me ask you if this is not Latripo sitting over here at the defense table. So we're arguing that basically in light most favorable to the government, you have to look at Salmaron's testimony and then you have to look at Salazar's testimony, Julio Salazar, and then you have to look at first going to Mr. Salmaron. The other problem with Mr. Salmaron's testimony is when he asked to identify Mr. Villalobos, he just points to a guy wearing a khaki suit over at the defense table. So I think the record, I could not tell from the record who that was. Now, just because something is traditional and it's just a way of procedure doesn't mean that it's the right thing to do or that it's permissible. In one of the cases I cited. What are you referring to? I'm sorry? What are you referring to when you say that? When the witness was asked to identify, when Mr. Salmaron was asked to identify who Mr. Villalobos was in the courtroom, he did identify somebody. What he refers to is somebody wearing that khaki colored suit. Earlier in that trial, there was some testimony elicited that both defendants had khaki colored suits. And so I was not the trial counsel. I, as a public counsel, could not say who they were referring to. And, you know, that was a problem for me. And Mr. Salmaron's testimony is very critical because he's the one that testifies that Mr. Villalobos is the one that he worked with at the Ministerio Público in Mexico, that he knew him for quite some time, that he knew him as La Tripa. I mean, that's the guy who really is a crucial witness for the government. But the problem that I have is, from the record, you can't really tell who he really identified. And I don't know if that was just because this trial was overlooked or what it might be. I'm just trying to understand what you were referring to when you said something just because it wasn't the right thing to do. And I didn't understand what you were pertaining to because you had earlier said something about prosecutorial conduct. Oh, yes. I'm trying to understand what your argument on that point was, whether you were saying something improper occurred or what. I was looking for clarity. Oh, yes. I mean, that was when you're in a five-day trial, sometimes something that's traditionally done in the courtroom, like just pointing to somebody in the courtroom and saying he's over there and then just kind of moving on. I mean, if you're not detailed as to what that evidence is supposed to prove— Is that what you're saying? I mean, are you saying that the defense counsel should have objected that that was an insufficient identification? I'm just trying to get at if what you're saying is tied to your argument of insufficiency as to your client, I'm just trying to get at precisely what you were saying went awry either by the prosecutor, the court, or something else. That's all. Oh, yes. I don't think that it— I think it probably amounts to like it was plain error because there was that you're correct. There was nobody objected to that during the trial. But therein lies the problem with the totality of the circumstances in that you have Mr. Leroy Milligan who, when he stood up in the courtroom and is looking at Mr. Villalobos, and this is Mr. Milligan worked with Mr. Villalobos for quite some time according to the testimony with La Tripa for quite some time and standing right in front of him, he couldn't identify him. And, you know, if this was a murder case and you're asking which is the guy that murdered the victim, and the guy stands up in trial and says, I can't see him. I mean, to me, in a state case, that would be like rating material. That would be like exonerating evidence. But in this case, it was just that was what the other problem is that the prosecutor suggests to Mr. Milligan, well, isn't that him over there? Or that's the problem. It's the totality of the circumstances here. It's not just the witness couldn't identify the defendant. It's that the prosecutor was testifying for him. And when the jury— Kennedy, are we really looking at whether the verdict against your client absent any trial error that you're arguing, whether there is sufficient evidence, viewed in the light and most favorable to the prosecution, that your client was the person being talked about? And you talk about the problem identifications, but there were some firm identifications from other witnesses where they're not. And isn't the jury— I mean, whatever closing argument was made by trial counsel for Villa-Lobos could have made the points that you're making now, and the jury held that there was sufficient evidence to show that the person sitting there was LaTrupa. Yes. Correct? That's correct. I mean, I'm not asking you to concede anything, but isn't that sort of what we're looking at? Yes, the jury can decide to believe that the witness is not— that his non-identification in the courtroom is— that that's not truthful and that what he said earlier was truthful. So you're right. And there were other witnesses that testified that identified Mr. Villa-Lobos, but their testimony is limited to a certain part of this conspiracy. And, for example, Mr. Salmaron, he was caught with 92 kilos of marijuana in Eagle Pass, and that's it. He testifies about receiving marijuana in Mexico, but where's the proof that that marijuana actually came to the United States? There's no—on the importation count, how do you prove that importation issue? Ms. Reyna, she—her story is bizarre. She has this story that she was accused of transporting cocaine, not even marijuana. We're talking about cocaine. Ms. Reyna's testimony is that she was accused of transporting cocaine and that she owed a debt, a drug debt. And then she kind of—they kind of gloss over in trial testimony that, well, after that she worked off her debt and she worked for LaTrupa. And she was the one that identified Mr. Villa-Lobos in the courtroom. She was one of the witnesses. But her testimony is—if you really look at it, what did she really say? All she really said is it's really—this guy threatened her, did some horrible things to her and extorted her for money. And that happened on the other side of the border. And that she worked for him. She's not specific. Did she transport marijuana? Did she cross the port of entry? Was she getting paid? It's very—it's a very generalized testimony. I think that, per evidence, Ms. Reyna's testimony, to sum it up, Ms. Reyna's testimony and Mr. Salamone's testimony, it's just not enough to—it's insufficient, coupled with—well, time's up— Finish your talk. Okay. It's the totality of the circumstances. It's the—the evidence is best for the government, the witnesses that do identify Mr. Villa-Lobos. Their testimony doesn't amount to what the government charged in the indictment. I mean, the indictment charges importation of marijuana. Ms. Reyna never said she imported anything from Mr. Villa-Lobos. And that's the problem. All right. Thank you, sir. You've reserved a bit of time for a vote. Ms. Friel, were you trial counsel? No, Your Honor. May it please the Court. Thank you, Your Honor. My name is Jennifer Friel, and I represent the United States. I want to begin with the issue around Count 4 and Lugo's assertion that there was insufficient evidence that he aided and abetted that attempted smuggling of firearms on August 7, 2012. Now, what we know about that load is that Saria Longoria drove from Piedras Negras to San Antonio in a Ford F-250 pickup. That Milligan took the vehicle, the Ford F-250, and added this external gas tank. Inside that gas tank, law enforcement found 43 assault rifles, handguns, and hundreds of rounds of ammunition. Compare this to a load a month later driven by Rivas, who had six assault firearms in the panels of a Monte Carlo. This external gas tank idea was a good one in that it could store a lot of firearms. Now, we have the testimony of Julio Salazar, who shortly thereafter does what? He takes a Ford F-250 from Piedras Negras to San Antonio, loads it full of weapons in an external gas tank, and drives down back. This is the MO, all right? This is the MO. They figured out this external gas tank was a great way to get weapons down. And Salazar talks to Lugo and says, hey, they tried to do this before and a lady got arrested just this summer. And I think a jury, a rational trier of fact, could reasonably infer that Lugo's role with these F-250s using the external gas tank was his action that aided and abetted the smuggling. So where is he involved in these gas tanks? Salazar says it was Lugo who was instructing him how to go about getting the external gas tank on the F-250. Now, Longoria said that she worked with Milligan. So there is a difference there, and I will acknowledge that. Lugo had a more active role with Salazar's gas tank than he did with Longoria's. It's also important to note that Milligan says that this Longoria's attempted smuggling was for TRIPA. She says it was for TRIPA. And the weight of the evidence shows that TRIPA and Lugo worked together. TRIPA and Lugo, Lugo is the main guy, and, excuse me, Villalobos, TRIPA is the main guy, and Lugo is his right-hand man. In fact, that Monte Carlo driven by Rivas, well, that load got taken, and Rivas had to have a tough conversation with Lugo, demanded $10,000 for those six weapons, said he'd kill him and his family and his children, and then said, and you've also got to answer to my boss, TRIPA. So this shows that those two were together. Rivas lost the load, and he didn't just have to answer to TRIPA. He didn't just have to answer to Lugo. He answered to them both. And the jury who heard how these two worked together and how Lugo was the enforcer could reasonably infer that those two were working together and that when Longoria and Milligan said, hey, it was TRIPA's load, that that scooped in Lugo. And this evidence, combined with what Salazar was told about they'd tried it before and a lady got caught, was enough for a rational trier of fact, especially when viewed in a light most favorable to the government. Certainly, this was a five-count indictment with two defendants. The majority of the evidence adduced at trial was with regard to the other counts, but there was sufficient under the evidence for the adding and abetting count to be affirmed. With regard to the identification issue, I think it's... certainly no trial is perfect, and the prosecutor could have been more clear in identifying the defendant. But there were very, very strong moments of clarity that Villalobos was La TRIPA, and Reyna's testimony really assailed it, and there's really no way to get around it. Claudia Reyna was extorted by La TRIPA. They pinned a loss of cocaine on her. Villalobos' TRIPA ordered her to go to an apartment where he held a gun to her head and demanded payment. It's pretty much harder to get any closer to a person to make identification than you can imagine them holding a gun to your head. And she identified him. There's corroborating evidence. His phone, Villalobos... his wife's phone. Villalobos is stopped at the border. The agents look through the phones, and his wife's phone says, tell TRIPA to turn on his phone. I need to talk to him. That's pretty good. I also have never quite understood the argument that he's TRIPA for the smuggling counts, but he's not TRIPA for the marijuana counts. There were lots of co-conspirators who testified, and no one said there was more than one TRIPA. Villalobos is TRIPA for 4 and 5. He's TRIPA for 1 through 3. And in addition to Reyna, you did have the identifications by Salmaran, Salazar, and Aguirre. So this was more than sufficient for a rational trier of fact to find that Villalobos was in fact La TRIPA. I would like to talk briefly about the life sentences because I know their life, and I know that's important. Did you have a question? No, no. I know that's important. I know that when someone is given a life sentence, that's something this court takes very seriously. And the life sentences in this case, Your Honors, I think are not greater than necessary to reflect the principles of sentencing outlined in 18 U.S.C. 3553, and particularly the need to protect the public. Because the evidence showed that Villalobos and Lugo together ran Piedras Negras and repeatedly threatened the lives of the citizens who lived there. We know that Rivas, who had the six guns taken, he was threatened, his life was threatened by Lugo and Villalobos. The lives of his children were threatened. He couldn't come up with $10,000, and the credibility of those threats was serious to him, serious enough that he went to the border and turned himself in and said, hey, if I don't turn myself in to U.S. law enforcement, I'm a dead man. Where does this case stack up with others? You know, it's within guideline sentence. I haven't seen them all, but I've been around here a little while, and not that this isn't bad, but I've certainly seen some worse characters or more horrendous facts and so on and so forth and all that, and hadn't seen them tagged with a life sentence. So this definitely got my attention when I saw it. So is this a charging issue, you know, in terms of how they were charged in the U.S. Attorney? Again, I'm not commenting that the life sentence... I mean, it's within the guidelines, but just in the heartland of all these cases we see with a lot of bad conduct, you know, life sentences don't seem to be tagged with them. Is there something particular, you know, in this case beyond the obvious facts that sort of got this one... Your Honor, the way we indicted, the United States Attorney's Office indicted it, it was a ten-to-life count, but we see ten-to-life counts all the time, so it was not the indictment. It really was when the probation officer put pen to pencil on the PSR and the enhancements just kept rolling in. These individuals used minors. That was a huge part of their operation. They used teenagers to take marijuana across the border. There weren't any murderers involved in... We were not able to prove up a murder. We proved that Villalobos did sexually assault Claudia Reyna. The jury didn't hear it, but it's in the PSR that when he held the gun to her head, he forced her to perform a sexual act, and he did not dispute that fact. They used minors to move the marijuana, and Lugo strapped a kilogram of cocaine to a teenager's 14-year-old's back. The teenager, who was also pregnant, strapped a kilo of cocaine to a 14-year-old pregnant girl and had her walk across the border. Some of the most difficult testimony, I think, came from Salazar's mother, who said that she allowed Trepa and Lugo to...they paid her, and she had marijuana at her home. She felt like she didn't have a choice. Law enforcement took the marijuana. Lugo called her more than 100 times asking for money, threatened her mother, threatened her children, threatened to kill them. She did the only thing she could, took out a loan, $5,000 loan, used her home as collateral.  and was still paying off that loan at the time of trial. What were the guidelines calculated to? To life, from where to where? Life to life. Life to life? They were at the end. I mean, but was there any option below life? Not a guideline. Guidelines were life. They actually, their offense levels went off the chart. And that's because of the PSR, the relevant conduct, et cetera, so there were no challenges to the PSR? There were no objections made to the PSR. And actually, we're on plain air review. The trial counsel didn't object to the life sentences. Whoa. So they did ask for something lower. And with regard to case law, the Romans case I cited in the 28J letter, I think was interesting in that it was also a marijuana case. Same charge. Conspiracy to distribute more than 1,000 kilograms of marijuana. Romans got a life sentence. He was from Chicago. He was running drugs from Mexico to Chicago. But reading through the facts of those cases, we don't see sexual assault. We don't see threats to people's lives, children's lives, family lives. We don't see the extortion that was rampant. Salmeron testified that the Zetas controlled Piedras Negras. They controlled the police. They had better guns than the police. Why did they have better guns than the police? Because Villalobos and Lugo were smuggling them from the United States to Mexico. So they're the reason, in large part, that that part of the world has so much violence and so much trouble. So for those reasons, I would ask the court to affirm the life sentences and the convictions. And our case law says that if the sentence is within the guidelines... It's presumptively reasonable. That also applies if you get a life sentence? It's presumed that that's a reasonable sentence? Yes, and the court, just in this May opinion that came down in Romans, said, yes, presumption applies. It is a life sentence, but... What's the general ages of... Do you remember offhand? I know one was born in 80, and one was born in 86. So they're younger than me. They're young guys. But so was Romans. And they ruined a lot of lives. Okay. So I do think the sentences are appropriate. Thank you. Thank you, ma'am. Mr. Lynch, we're back to you. Thank you. You didn't raise anything initially about the life sentences if we brought it up, but... I would like to... Yeah, if I could... I'll try to do a minute and a minute. I'd like to go back and take another shot at Judge Southwick's question about this down to the same thing. Here's the big problem. What did Lugo do? They have no evidence of an affirmative act, and that's the problem. He's identifying perhaps with the conspiracy, and they convicted him of the conspiracy. But they don't have that affirmative act, and he sought to help the activity succeed. You know, Macias provided the truck. Macias provided the directions. He provided the money. Milligan did the hiding. There's no evidence that Lugo did anything on August. I put out one... Did the government say that he instructed him on how to make the tank or something? On a different occasion. On a different occasion. And I'm not sure I agree with that. I think if you read the record, Milligan is the tank guy. He may have said something like, you know, they're gonna put it on, here's how they'll do it. But Milligan's the tank guy. He's the guy who makes it. So I just don't think the government proved the involvement. I'd also note one other quick thing. And what's the best case you're relying on for that argument? I don't think there's a case right on point. I think this is very clearly a legal point. They are required to show he sought... It's a very clear legal rule. Here, the evidence doesn't meet that legal rule. We got a fully tried jury case. We got a massive evidence. We got a lot of evidence there. There's no objections. The patent charge is given. There's no objection to the patent charge on aiding or abetting, on conspiracy. You got all this evidence out there beyond the witness. So, I mean, you, in effect, would be making an argument that the jury could not infer from this totality of evidence the point you're making. And that's why I ask, what's your best case? In a case where there's very little evidence, you know, a half-day trial. I mean, there's just kind of... It's a scintilla. And if you're making the argument, you know, that you're making, yeah, okay, I'm leaning back. But a fully tried case, all this evidence mixed in, you know, jury gets. There's a difference between aiding or abetting. There's a difference between conspiracy. It's honed in. There's no objection, Your Honor. Dot, dot, dot. They get it. And as was alluded to, presumably, trial counsel argued to the jury. Blah, blah, blah. So, we got that full range. So, to ask the appellate court to reread the transcript and to say that construing the evidence in light most favorable to the government, the jury couldn't get there. I mean, that's a pretty stout argument to make. I mean, you're making it, and you should. But unless you're anchoring it to some case or a close case to say, well, there's none on point, but it's like this or whatever. I just want to make sure before you left the podium that I wasn't missing. Okay. In your brief, some case you're pointing to say, well, it's not exactly this, but this is, but if you're making it as a record argument, I got you. It's a record argument. I'm a stout guy. That's apparent. But it's a record argument, Your Honor. And I think the law is very clear. Yes, there's a lot of evidence, but a lot of evidence is not specific evidence. And what's lacking in this case is specific evidence. Yeah, but see, you seem to be making an argument of saying what's lacking is direct evidence, and you're not. You're missing the point. You're a good lawyer. That's why you're here. Judge Salford asked you directly, was there direct evidence? And we all know the jury can get there other than by direct evidence. But I mean, we're not missing the point. You're a good advocate, and you're making the argument that you need to make on it. And I know your light's red, but I'm still going to let you have time to deal with the sentence. Could I answer that just very briefly? Yeah, go ahead. Ms. Frill said she wants you to work backwards from Rebus. She wants you to convict on an M.O., but they were separate loads. We don't have a showing. Lugo has an active role in this one. I would point out that Salazar, in his testimony, supposedly connecting Lugo but without an active role, says this was already July. Well, what is the government's... Is the jury supposed to excuse that, too? Well, July, August, that's close. I mean, guilty, innocent, that's close. They have to prove specific evidence, and they didn't. I mean, I think the Rojas case is close. It's a very different kind of drug crime, but, you know, it's a matter of, did you actually take a specific act that would advance the crime? So I think Rojas, in many ways, is the closest case. All right, I'm going to give you some more time, so... I agree with you that there is insufficient evidence on the aiding and abetting count. How would that affect the sentencing guidelines in the case, or would it? Would there still be a live sentence there, or would it reduce the guidelines in any way? I don't believe it would reduce the guidelines in any way. The guidelines are very effective at getting to a very high score fairly quickly, and there were a lot of things that he was subject to. On the sentence, I do think it's unreasonable. I will acknowledge we have a plain error problem. One, I would ask this court, and I know you're going to love this, I would be really happy for this court to invite me to file a petition for en banc review so that we could look at why an objection has to be made when an argument has been made that a lesser sentence should be imposed. If there ever was an... If there ever was a pound, you would be making an argument about... invoking the en banc process sua sponte. This is not it. But I shall ask you, if the opinion comes out the way I suspect it will, that almost every other circuit does not require an objection, and almost every other circuit has pointed out that Rule 51 specifically states that exceptions are not required, and the post-sentence objection to substantive reasonableness is an exception. An argument has been made for a lower sentence. That is the argument. The court has been made aware of it. The court has dealt with it. To require a post-sentence objection is essentially to require an exception. What's the deal about... I mean, go back to Hornbeck law. I mean, go back to the point. We see a lot of cases, and this is off the time, but we see a bunch of cases where, you know, it might be a difference made if there was an objection below, and there's not. So it's almost like they're teaching now, don't make objections, you make the judgment. And so here, you got guys with life sentences, you got all this stuff, and, you know, there's, you know, no objection made, even if it's, like, pro forma. So here's a life sentence. I mean, it may not get you anywhere, but, you know, good advocates, so it's just odd in some instances we get these records. I mean, it's not. You got a PSR here loaded with stuff, and, you know, there's no objection to it or anything. Well, the judge, you know, has it, they consider it, and you get to appeal. I mean, even if the objection below was made, doesn't have enough... But, I mean, it's there, and then you get the guidelines. I mean, that's just a tough sled. You're appointed counsel, both of you are, and you get it, but anyway. Well, I absolutely agree, Your Honor. But what I am suggesting is that the law from Gall and Kimbrough, the law in almost every other circuit, is that this is a different circumstance. This isn't a matter of I let an evidentiary objection go by, and then I come in, which I've done. I didn't let it go by, but I've been the appellate lawyer, and I've come in and said, this is actually so important, it should be corrected as plain error. But this is a case where... He didn't do the best job, but the appointed counsel at least made an argument for a lower-than-life sentence. And to simply say at the end, well, I object, doesn't change the arguments that he made. And so to pretend that those arguments go away because he didn't make a pro forma objection exception seems to me wrong. And I think there's only one other circuit that requires that type of objection, and I think it is inconsistent with the federal rules of criminal procedure, and I think it's not particularly consistent with Gall and Kimbrough, and that's why I issued that invitation, or perhaps I'll do it on my own. But thank you. Your Honor, as you just said, the way Paul is even assuming some vitality to your argument, it doesn't strike me this is the best case that you'd get traction on that issue. Not that the issue itself, you know, any abstract might do, but just from what I know about this case, it doesn't seem like this is the best case to make the point that you're making because of other kind of things that could easily indicate to just not get to that issue. But that's just a thought off the top. But we appreciate your advocacy on the point, and I'll say another word about that in a minute. But let me see if Mr. Morales, you have two minutes for rebuttal. I gave Mr. Lynch a little additional time. We got, you know, the serious sentences, and I just... But you got rebuttal. Yes, Your Honor. May it please the Court. Your Honor, in respect to the live sentence, I think... Well, not what I think matters, but the problem with practicing as a trial attorney is you don't practice as an appellate counsel. So these rules that are put in to effect... And like me, I'm a trial attorney, and so I'm learning from this experience. But trial counsel don't know the procedure in place, what you got to say, what you got to ask for at a 20-minute sentencing hearing to preserve that earth. Mr. Morales, I mean, the three of us, you know, we're in dinosaur land, but back then, it was hornbook. You object. I mean, you don't offend the tribunal, but you object. Your Honor, I object. Denied. Can I have a running objection? Yes. Can I put the objection on, you know, afterwards? Whatever. I mean, it was sort of hornbook. It just taught you to make an object. It may not get you anywhere, but it preserves it. Here, if you get a run where nobody says a P on an issue, like the worst lawyer in the world, you know, with this, don't even understand it. Say, I object. Why? Because I don't understand it. You know, but it's out there, and that's to me not... I guess your point about not being an appellate counsel is just sort of like the base instinct. You know, my clients get a life sentence. I'm going to object. What's your grounds, counsel? I don't know, Your Honor, but I object. You know, but... I'm not trying to be facetious, but I'm just saying you're looking at a PSR, you know, from yea back, looking at a guideline, et cetera, et cetera, and I don't mean make silly objections. I'm just saying that, you know, on the record, when there's no objection, you got to go up against plain error. To me, it's just... it's a tough sled. Yes. This sentence is within the guidelines. You heard the question. You know, I mean, so given the guidelines and stressed out, even if we wanted to or saw some basis to grant your client relief on the life sentence, how would that be? Your Honor, the counsel for the government addressed what happened with Mr. Salazar's mother, how she was, you know, had been extorted for money, and, you know, but that's another... that ties in back to that identity issue where Ms. Lopez, I'm sorry, Ms. Martha Lopez, she couldn't identify Mr. Avilobos in the courtroom, standing right in front of him, but yet that evidence is a consideration for his life sentence. And so you have a situation where you... you can't look at it tunnel vision. I mean, it's hard to... this is a tough case. There's a lot of evidence, but if you piecemeal it, you have to piecemeal it, because, well, in other words, Mr. Avilobos deserves a life sentence because he raped, allegedly... well, raped, it wasn't presented at trial, but it was on... it was in the PSR. He raped a woman, which was not part of the drug conspiracy, and then he extorts the mother of another mule. And... but that evidence of that... the mother of the drug mule, she... that witness could not identify Mr. Avilobos in the courtroom. It's just kind of... kind of the nature of confecting the PSR and so on and so forth once... once it's done. I mean, I think we get your argument on that. Mr. Morales and Mr. Lynch, you're both court-appointed. You've done yeoman service to the court in a whole bunch of cases, and you get these cases often with, you know, difficult situations, but you're both very able advocates on behalf of your client, and our court as a whole really appreciates you and all other similarly-situated court-appointed counsel for coming and making the arguments to us, the briefing and so forth, and we thank you for that. Have you said that? And I'm sure your voucher will be done in a timely and fairly manner. Go ahead. Thank you, sir. Appreciate it.